```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
GERMAN GARCIA,                                              :
                                                            :          **MEMORANDUM DECISION**
                                         Plaintiff,         :          **AND ORDER**
                                                            :
              - against -                                   :          14 Civ. 4798 (BMC)
                                                            :
CAROLYN W. COLVIN, Commissioner of                          :
Social Security Administration,                             :
                                                            :
                                         Defendant.         :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Plaintiff seeks a review of the Commissioner's determination that he is not disabled for purposes of receiving disability benefits under the Social Security Act. He raises three points of error in the decision of the Administrative Law Judge: (1) the ALJ improperly applied the treating physician rule; (2) the ALJ did not adequately explain her problems with plaintiff's credibility; and (3) the ALJ's hypothetical to the vocational expert was not accurate. I hold that the ALJ's decision was based on substantial evidence and does not contain any procedural errors.

## BACKGROUND

This is primarily a neck and back pain case, the kind of case that is often very difficult for courts, and I expect ALJs, to evaluate. Plaintiff was injured in a car crash in February 2006. He claimed disability through February 28, 2010, as he returned to work on March 1, 2010, at which time he was obviously no longer disabled.

This is the second trip this case has made to federal court. In the first, Judge Dearie remanded the case for a further hearing, finding merit in each of the points of error that plaintiff again raises here. Plaintiff relies heavily on Judge Dearie's critique of the decision from this first hearing, going so far as to almost suggest that Judge Dearie all but decided the case. However,

the remand order is largely immaterial at this stage, since plaintiff had a second hearing before a different ALJ and the decision as to which he seeks review is entirely different. At the second hearing, while the evidence from the first hearing was incorporated into the record, the ALJ also obtained a review of records and testimony from a Medical Adviser, a Board Certified orthopedist named Dr. John W. Axline, and relied on a consultation by an internist, Dr. Luke Han, which the initial ALJ had not mentioned in the prior decision.

The treating physician issue turns largely on the ALJ's weighing of the opinions of two of plaintiff's treating physicians, Dr. Laxmidhar Diwan, an orthopedic surgeon, and Dr. Deepika Bajaj, a neurologist, against that of Dr. Axline and Dr. Han.[1] Plaintiff started visits with Dr. Diwan shortly after his accident in February 2006 and continued seeing him approximately monthly through March 2007. He visited Dr. Bajaj during the same period, but less frequently, through November 2006, at which time he started seeing Dr. Bajaj approximately monthly through March 2007, once during that Summer, and starting again, as his social security proceedings ramped up, through the late Fall of 2007 and continuing through August 2008. (His first disability hearing, the one resulting in the decision that Judge Dearie remanded, was in September 2008, and, as noted, he was fit for work by March 1, 2010.)

During this Diwan-Bajaj period, plaintiff had a number of tests which no one disputes showed some level of spinal abnormality. Most of these tests were performed shortly after his car accident during February and March of 2006. Thus, an MRI of his cervical spine in February 2006 showed that the normal C-curve of the neck, where the tips of the C are supposed to point away from the face of the patient, was straightening or even reversing its direction. He had bone spurs in the middle of his neck (as is common with age), more towards the right which,

---

[1] There are other health care professionals who saw plaintiff, but those described below formed the primary basis for the decision on disability.

according to the radiologist who read the report (but with whom Dr. Axline disagreed), were pushing or compressing the casing over the spinal cord. In the middle of his neck, he had bulging discs, also with bone spurs. Again, according to the radiologist, he had compressed nerves throughout his neck.

Plaintiff had an MRI of his lumbar spine on March 8, 2006. It showed pretty much the same thing as his neck MRI, i.e., bulging discs, compression of his thecal sack, a herniated disc, and bone spurs. The next week, he had an electromyography ("EMG") and nerve conduction test, which Dr. Bajaj thought was consistent with pain on the right side of his neck. His next MRI was in December 2006, this time of his thoracic spine. It showed herniated discs between the top and middle of his thoracic spine.

Rather than go through the observations that Drs. Diwan and Bajaj recorded during each of their visits with plaintiff, it would be more useful to start with their conclusions, as it is the ALJ's rejection of those conclusions which account for her decision. We know the physicians' conclusions because between them, they completed six questionnaires.[2] They showed the following:

| DATE | PHYSICIAN | NATURE OF QUESTIONNAIRE AND CONCLUSIONS |
|---|---|---|
| 1/31/07 | Diwan | "Spinal Impairment Questionnaire." The doctor diagnosed cervical, thoracic, and lumbar radiculitis secondary to herniated discs, and lumbar scoliosis. |
| | | The doctor checked boxes showing the presence of the following: nerve root compression; neuro-anatomic pain distribution; limitation of spine motion; motor loss; positive straight leg raising (but he left blank the requested degree); lumbar spinal stenosis resulting in pseudoclaudication, manifested by chronic non-radicular pain and weakness; inability to use public transport or drive more than ten minutes regularly; inability to climb a few steps at a reasonable pace |

---

[2] Although less significant legally, plaintiff's chiropractor, Dr. Bruce Alpert, also filled out a spinal impairment questionnaire. It was generally consistent with those of Drs. Diwan and Bajaj.

| | | |
|---|---|---|
| | | with a handrail; requirement of a cane or crutch to walk; impairment seriously interferes with plaintiff's ability to initiate, sustain, or complete activities; inability to grasp; inability to handle files; and presence of severe pain.
Other checked boxes showed no sensory or reflex loss, the presence of ability to walk one block, and the presence of ability to prepare simple meals and attend to hygiene.
Dr. Diwan did not answer whether plaintiff could carry out routine ambulatory activities like shopping and banking.
For "medical signs or laboratory findings" to support these conclusions, Dr. Diwan referred to plaintiff's cervical and thoracic spine MRIs. When asked about plaintiff's responsiveness to treatment, Dr. Diwan noted that plaintiff had had physical therapy, but had not seen improvement. |
| 1/31/07 | Diwan | "Residual Function Capacity Form." The doctor believed plaintiff was totally disabled.
The doctor circled "2" showing that plaintiff could sit, stand, and walk for two hours at a time intermittently in each eight-hour work day.
The doctor checked boxes showing that plaintiff could occasionally lift and carry ten pounds, but could not bend, squat, crawl, or climb.
Other determinations by the doctor showed: plaintiff could use both hands for repetitive grasping and fine manipulations; could not push or pull with either hand; and that plaintiff's hearing, seeing, and speaking were within normal limits. |
| 9/11/2008 | Diwan | "Spinal Impairment Questionnaire." The doctor diagnosed bulging/herniated discs, a disc abnormality, and narrow foramen.
The doctor checked boxes showing the presence of the following: nerve root compression; neuro-anatomic pain distribution; limitation of spine motion; motor loss; sensory or reflex loss (noting decreased sensation on the right side); positive straight leg raising (but he left blank the requested degree); lumbar spinal stenosis resulting in pseudoclaudication, manifested by chronic non-radicular pain and weakness; inability to use public transport or drive for more than ten minutes regularly; inability to walk one block; requirement of a cane or crutch to walk; impairment seriously interferes with plaintiff's ability to initiate, sustain, or complete activities; inability to place files in a file cabinet at or above waist level; and presence of severe pain.
Other checked boxes showed plaintiff was able to carry out routine ambulatory activities like shopping and banking; the presence of |

4

|  |  | ability to prepare simple meals and attend to hygiene; the presence of ability to climb a few steps at a reasonable pace with a handrail; and the presence of ability to handle files.

Dr. Diwan did not answer whether plaintiff could grasp.

Dr. Diwan indicated there were "medical signs or laboratory findings" to support these conclusions, but did not indicate what they were. |
|---|---|---|
| 9/11/2008 | Diwan | "Residual Function Capacity Form."

The doctor circled "2" showing that plaintiff could sit, stand, and walk for two hours at a time intermittently in each eight-hour work day.

The doctor checked boxes showing that plaintiff could occasionally lift and carry ten pounds and could bend, but could not squat, crawl, or climb.

Other determinations by the doctor showed that plaintiff could use both hands for repetitive grasping and fine manipulations; could not push or pull with either hand; and that plaintiff's hearing, seeing, and speaking were within normal limits. |
| 9/11/2008 | Bajaj | "Spinal Impairment Questionnaire." The doctor diagnosed cervical radiculopathy and thoracic spine derangement.

The doctor checked boxes showing the presence of the following: nerve root compression; neuro-anatomic pain distribution; limitation of spine motion; positive straight leg raising at 35 degrees in both the supine and sitting positions; inability to walk one block; inability to carry out routine ambulatory activities such as shopping and banking; inability to climb a few steps at a reasonable pace with a handrail; requirement of cane or crutch to walk; impairment seriously interferes with plaintiff's ability to initiate, sustain, or complete activities; inability to grasp; and the presence of severe pain.

Other checked boxes showed: no motor, sensory or reflex loss; no lumbar spinal stenosis resulting in pseudoclaudication, manifested by chronic non-radicular pain and weakness; presence of ability to use standard public transport; and presence of ability to prepare simple meals and attend to hygiene.

Dr. Bajaj did not answer whether plaintiff could drive for more than 10 minutes regularly or handle files.

Dr. Bajaj did not indicate whether there were any "medical signs or laboratory findings" to support these conclusions. |

| 10/1/2008 | Bajaj | "Residual Function Capacity Form." |
| --- | --- | --- |
| | | The doctor circled "2" showing that plaintiff could sit, stand, and walk for two hours at a time intermittently in each eight-hour work day. |
| | | The doctor checked boxes showing that plaintiff could occasionally lift and carry ten pounds, bend, squat, crawl, and climb, and that plaintiff could use both hands for repetitive grasping, fine manipulations, and pushing and pulling. |
| | | The doctor did not note the presence any hearing, seeing, or sensory limitations. |
| | | Dr. Bajaj also indicated the presence of severe muscle spasms and pain in lower back, adding that heat and cold make spasms worse. |

On the other side of the disability ledger was Dr. Axline, who testified extensively at the hearing. He did not simply reach his own conclusion as to plaintiff's impairment; rather, his criticism of the conclusions reached by Drs. Diwan and Bajaj was unusually direct and pointed. It is hard to capture the vehemence with which he disagreed with plaintiff's physicians without quoting his testimony at considerable length, but, in essence, he went line by line through their conclusions and explained why, based on the record, their conclusions were in some instances unsupported by their notes, and in many others, actually contradicted by their notes. For example, in disagreeing with the conclusions that Dr. Diwan expressed, Dr. Axline testified:

> . . . Dr. Diwan, the treating physician . . . assigned [plaintiff] a lift carry limit of 10 pounds occasionally. He said he could do no push and pull and the combination of sitting, standing and walking would only add up to two hours in an eight hour day, therefore he was totally disabled. He did not cite the basis for the opinion. On the same exhibit we have a form filled out, an attorney's spinal questionnaire, pages four to seven and it said the patient had a spinal condition and nerve root compression. Up to this point no nerve root compression is shown by any exhibit. He said that the patient has motor loss. There's no motor loss described in the record. He said the patient had lumbar stenosis . . . [but] the canal is normal as I cited when I gave you [i.e., summarized] the MRI . . .. He was unable to use public transport. He gave no basis for that but he had been recorded he could drive. He said the patient could not walk one block but we have no impairment of walking documented. He says he required an assistive

> device to walk and he said the patient cannot walk up a few stairs but if you look at Exhibit 14F, the patient said he could walk up stairs.
>
> …
>
> So I found this report to be totally untrue and this is, apparently the doctor [] trying to help the claimant but he's not citing facts. The record shows that most of his statements are not true at all.
>
> …
>
> [A]ll the things he said was present are not present, are contradicted by other exhibits which reduces the value, to me, of the opinion with Dr. Diwan.

Dr. Axline's criticisms of Dr. Bajaj's conclusions were similar, and he pointed out inconsistencies between Dr. Diwan and Dr. Bajaj. He also disputed the radiologist's reading of one of the MRIs, finding that he was "over reading" the results in finding 16 instances along the spine of foraminal narrowing: "It is not likely that any patient has that many narrowed foramina." In addition, once told that plaintiff had gotten a job doing landscaping work in 2010 (at the end date of his claimed disability period) that required lifting 20 pounds and bending, Dr. Axline opined that it simply was not possible for the conclusions, made two years earlier, of Drs. Diwan and Bajaj to have been correct:

> [ALJ]: Right, well . . . he said he's improved so that he can do that kind of work.
>
> [Dr. Axline]: I know, but the thing is, if . . . [one accepted] the opinion of his treating physician during the period in question[,] he would not be able to do the work he's now doing . . ..[3]

In a vigorous cross-examination, plaintiff's attorney challenged Dr. Axline on a number of points. Her main point was that plaintiff's doctors had specifically diagnosed radiculopathy, and Dr. Axline nevertheless found no evidence of nerve root compression. Plaintiff's attorney pointed out to him that radiculopathy necessarily involves nerve root compression, a point with

---

[3] The transcript quality is very poor. I have attempted to reconstruct it as accurately as possible.

which Dr. Axline agreed, but to him, there was no evidence of nerve root compression and thus no basis for the radiculopathy diagnoses.

Another point she challenged was Dr. Axline's view that nothing in the record supported the treatment prescribed by these doctors. He stated:

> [T]he problem in this case is that we have doctors who use nonstandard treatments. The treating physicians were allowed to recommend haphazard care [such] as giving injections with B12 in the muscles of the spine and they write reports which contradict their examination results so we have treating physicians who normally you pay [attention to], give great weight to their opinions.

It was not only the doctors with whom Dr. Axline disagreed. He had also reviewed the brief to the Appeals Council that plaintiff's attorney had submitted prior to the proceeding before Judge Dearie, and he described where that brief went wrong in portraying the medical record:

> It says, for instance that there's severe degenerative joint disease as the diagnosis but that is not true. There is not present in this record. It said Dr. Bajaj says he has nerve root compression. That's not true and she says that patient cannot shop or bank but [Exhibit] 6F says he can. She said he could only sit, stand and walk a total of two hours but 6F finds otherwise and she says hot and cold make him have spasm worse but on examination page, physical 6F no spasm is found. It said he cannot push or pull but she, the record shows he can do child care and . . . there is no evidence of nerve root compression. She said he cannot walk one block but 6F says he can. Cannot file above his waist level. There's no basis in the record that I saw that supports that opinion of hers, said that he has, the EMG is consistent with lumbosacral radiculopathy and, again, we've talked over that is that means, L4 on the left or right, L5, S1[. The brief] said there's a stenosis of the spinal canal and if we look at [Exhibit] 14F there's no such stenosis and she said that his impairments impede the limits of listing 1.04. [The brief] says he cannot perform fine and gross movements of his hand. Her basis for that opinion is not shown and the examining doctors said he could.

In addition to Dr. Axline, conclusions generally consistent with non-disability had been reached by Dr. Luke Han, an internist, who had examined plaintiff prior to his first hearing before an ALJ.[4] Dr. Han found that plaintiff had no physical restrictions. Dr. Han found that

---

[4] At the first hearing, plaintiff's attorney objected to the admission of Dr. Han's findings on the ground, according to her, that he had only examined plaintiff for ten minutes. The ALJ at the first hearing overruled the objection, but did

8

plaintiff's neck was fine, his lower back had good flexion, although he had some pain, and there was nothing wrong with the middle of his back. He had full motor strength, normal reflexes, and normal hand and finger dexterity. Dr. Han noted plaintiff's self-described ability to care for his children, take care of his own hygiene, shop, and go for walks. Plaintiff had no problem walking or standing and could walk on his heels and toes without a problem. He could squat halfway down. He did not use a cane or a crutch. Dr. Han diagnosed plaintiff with obesity, high blood pressure, acid reflux, and lower back pain.

## DISCUSSION

I will not repeat the familiar five-step framework for evaluating disability claims, but will focus instead on the points of error raised in plaintiff's motion.

## I. Violation of Treating Physician Rule

In weighing medical opinion evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 404.1527(c). These rules indicate that, generally, more weight is given to the following: (1) opinions provided by physicians who have actually examined a claimant; (2) opinions provided by a claimant's treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a whole; (5) opinions of specialists about medical impairments related to their area of expertise; and (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention. Id. The second factor requires that the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

---

not cite to Dr. Han's report in finding unfavorably to plaintiff. At the second hearing, plaintiff's counsel did not object to Dr. Han's report, and the ALJ did rely on it, in part, in finding unfavorably to plaintiff.

evidence in [the claimant's] case record." Id. at § 404.1527(c)(2). This is known as the "treating physician rule." See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

The main point that plaintiff makes with regard to the treating physician rule is not that the ALJ failed to properly apply the rule, although he may be making that point in passing, but that the ALJ failed to follow Judge Dearie's direction on how to apply it, quoting Judge Dearie's decision at considerable length. Plaintiff even goes so far as to assert, "Judge Dearie states that plaintiff should be found to meet the listings."

That, of course, is not what Judge Dearie held; if he had, he would have remanded the case solely for the calculation of benefits. Instead, he stated that "[w]ithout Dr. Diwan's or Dr. Bajaj's opinion, the ALJ had no medical authority left to support his conclusion that plaintiff did not meet or equal any listed impairment." That was certainly true, but at this point, it merely underscores the fact that we have a very different record before us than Judge Dearie had before him. Judge Dearie did not have Dr. Axline's testimony, nor Dr. Han's report (because the ALJ had not referenced it), nor the fact that plaintiff undertook landscaping work the day after he contends that his disability period ended. Because of this material alteration of the record, the issue is not whether the Commissioner properly followed Judge Dearie's directive; it is, rather, whether the ALJ, in the current decision under review and on the current record, properly applied the treating physician rule.

By design, it is difficult to reject the opinions of treating physicians. But it is not impossible, and it is not even as difficult as plaintiff asserts. Plaintiff takes the extreme position that "[t]he purpose of a medical examiner is not to assess residual functional capacity but to explain medical terms." I do not think the purpose is so limited. References to a broader use of medical advisors and consultants appear often in the social security regulations. As the

Commissioner has stated in SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. July 2, 1996), for example: "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."

I emphasize that it is not my function to weigh the physicians' testimony and determine which is more credible. That is the function of the ALJ, while giving due deference to the default of the treating physician rule. In a federal court review, it may be apparent as a matter of law that a medical adviser's opinion is too insubstantial to warrant disregarding the treating physician rule. But where the medical adviser who is a specialist in the area gives a medically informed, pointed, and responsive rebuttal to the treating physicians' conclusions, then unless the federal court can find something obviously lacking in that rebuttal, it is hard to disagree with the ALJ's determination to accept it. Unlike many cases I have seen, this was not a case where the conflicting medical opinions passed each other like ships in the night. Dr. Axline steered his ship directly into plaintiff's treating physicians, and I see nothing so fundamentally wrong with his analysis that the ALJ was precluded from determining that Dr. Axline's opinion survived the collision better.

There are glaring examples in the treating physicians' reports of conclusions unsupported by the record, as Dr. Axline pointed out. For example, Dr. Diwan's conclusion that plaintiff has a gripping problem is simply not based on anything that I can find; everything except his conclusion is to the contrary. Likewise, on one occasion Dr. Diwan indicated that plaintiff had motor loss but no sensory or reflex loss. Later on, he indicated that plaintiff had motor loss and sensory or reflex loss. Yet Dr. Axline explained that Dr. Diwan's treatment notes do not reflect that plaintiff had any motor, sensory, or reflex loss. Significantly, there is also contradiction,

which existed at the time of Judge Dearie's review, between Dr. Diwan's conclusion that plaintiff has stenosis with pseudoclaudication, and Dr. Bajaj's conclusion that plaintiff does not. Dr. Axline sided with Dr. Bajaj, explaining why, and I do not see why the ALJ could not accept Dr. Axline and Dr. Bajaj (as well as Dr. Han) on that point; she had to reject one of plaintiff's treating physicians.

One good illustration of the reason for my conclusion is the confrontation at the hearing between plaintiff's attorney and Dr. Axline, which continues in the briefing, regarding one of the treatments that Dr. Diwan applied – trigger point injection of Vitamin B12. That is, Dr. Diwan injected some form of Vitamin B12 directly into the painful muscles of plaintiff's back. Dr. Axline condemned it, effectively saying that this procedure is useless, that there was nothing in the record to support a finding of a B12 deficiency, and that even if there was one, trigger point injections are not done. Plaintiff's attorney feels so strongly to the contrary that she has annexed to her brief in this case an abstract of a study from the internet in which a group of Italian researchers concluded that procedure is effective for lower back pain (although she did not request the ALJ to keep open or reopen the record so she could produce additional evidence on this point).[5] Putting aside the fact that the ALJ did not have this in the record, and that it is not dramatic impeachment in any event, I cannot find anything so plainly wrong with the opinion of

---

[5] I do not think it strays from the record to note that I reviewed this study on the internet, since plaintiff's submission was obviously incomplete. There, on the same page (although plaintiff did not give it to me), is a link to another abstract of a study conducted eight years later which concluded that "[t]here is insufficient evidence to support the use of injection therapy in subacute and chronic low-back pain. However, it cannot be ruled out that specific subgroups of patients may respond to a specific type of injection therapy." J. Bart Staal, et al., *Injection therapy for subacute and chronic low-back pain*, abstract available at http://www.ncbi.nlm.nih.gov/pubmed/18646078. Notably, the study referenced in this abstract appears to concern analgesic injections at trigger points which, regardless of their efficacy, are widely used. The disparate treatment of trigger point injections of vitamins into muscles, when it is common knowledge that vitamins are delivered via the bloodstream through oral or intravenous injection, strikes me, as a layman, as more than passing strange. That is of course irrelevant, but the point is that the abstract submitted by plaintiff is hardly the categorical invalidation of Dr. Axline's opinion that plaintiff contends.

Dr. Axline that it undermines the objective inconsistencies within and between Drs. Diwan and Bajaj that he observed.

In arguing that the law all but prohibits an ALJ from accepting a medical adviser's opinion over that of a treating physician, plaintiff cites to a number of older cases like Vargas v. Sullivan, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that 'the written reports of medical advisors who have not personally examined the claimant 'deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.'") (quoting, Allison v. Heckler, 711 F.2d 145, 147-48 (10th Cir. 1983)) (quoting Woodard v. Schweiker, 668 F.2d 370, 374 (8th Cir. 1981)) (quoting in turn Landess v. Weinberger, 490 F.2d 1187, 1190 (8th Cir. 1974)). The cases he cites, however, were decided before the Social Security Administration codified the treating physician rule. Prior to that time, the federal courts, including the Second Circuit, had applied their own judicially created treating physician rule, but the codification in the regulations changed the judicial version to somewhat dilute the required weight to be given to the treating physician's opinion. As the Second Circuit observed in Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993):

> The regulations resemble but also differ from our treating physician rule in various ways. For example, like our rule, the opinions of treating physicians are accorded more weight than those of non-treating physicians. However, by granting the treating physician's opinion "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the regulations accord less deference to unsupported treating physician's opinions than do our decisions.
> …
> They also differ from our rule because they permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record.

13

Notwithstanding the regulations' reduced deference to treating physician decisions, the Court held that "[b]ecause the regulations are valid, they are binding on courts." Id. at 568. Thus, it is not helpful to cite, as plaintiff does, decisions that pre-date the enactment of the treating physician regulations.[6]

Finally, although plaintiff strenuously objected at the administrative hearing, I have to agree with the ALJ that the fact that plaintiff was able to undertake at least light and maybe even medium labor one day after the alleged end of his disability period supports Dr. Axline's view that he was not disabled. It simply cannot be that plaintiff went from being disabled on one day to undertaking landscaping work the next day. Since that is not plausible, the unanswered question is, assuming plaintiff was disabled at some point, when did he recover? A month before he began working? Six months before? A year before? There was nothing in the record that would have enabled the ALJ to fix the recovery date, and plaintiff's attorney supplied no rationale for deciding on a recovery date. This tended to support Dr. Axline's opinion that the only impairment plaintiff had was non-disabling back pain because at some point, that clearly became true.

To put it colloquially, the treating physician rule required the ALJ to accept the conclusions of the treating physicians unless the record gave him a darn good reason not to. I think Dr. Axline's opinions constitute such a reason, and I therefore find that the ALJ did not err in her application of the treating physician rule.

## II. Failure to Explain Credibility Findings

The point heading in plaintiff's brief is "THE ALJ ERRED IN FAILING TO FOLLOW THE ORDER OF JUDGE DEARIE IN EVALUATING PLAINTIFF'S CREDIBILITY."

---

[6] A number of district courts, some of which are cited by plaintiff, continue to cite cases and quote language from cases that were decided prior to the regulations.

14

Again, since the record and decision under review is substantially different than those that were before Judge Dearie, the question for me is not literal compliance with Judge Dearie's observations of the deficiencies in the prior decision, but whether the decision under review complies with the requirements for evaluating credibility under the law and the Social Security regulations. I hold that it does.

It is true, as plaintiff complains, that the ALJ in the present decision used the boilerplate phrase,

> [a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

I have previously criticized the use of this language, see Batista v. Colvin, No. 13 Civ. 4185, 2014 WL 2618534, at *2 (E.D.N.Y. June 12, 2014), as it often stands alone as a substitute for any analysis of credibility. Social Security Ruling 96–7p sets forth a substantial number of factors that bear upon the analysis of credibility (e.g., plaintiff's daily activities; the location, duration, frequency and intensity of his pain; effectiveness of medication; etc.). See SSR 96–7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996). The Second Circuit requires that "a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).

But the ALJ in the instant case did far more than simply paste in the boilerplate. What follows it is an extensive discussion of the reasons for discounting plaintiff's testimony. These include all of the factors referenced in SSR 96-7p, and citations to the record supporting the several contradictions between plaintiff's testimony and the medical record. Plaintiff quibbles

15

with these findings, but they are supported. I find no error in the ALJ's reasoning as to why she gave reduced credibility to plaintiff's testimony.

**III. Improper Hypothetical to Vocational Expert**

This point of error is easily disposed of. It is premised on the alleged need for the ALJ to have rejected Dr. Axline's and Dr. Han's findings, and to not use them in the hypothetical. Putting aside the issue discussed in Point I above regarding how to balance those findings against those of plaintiff's treating physicians, there still was no error in a hypothetical that was based on Dr. Axline's and Dr. Han's findings because there was evidence in the record to support the hypotheticals. Significantly, after the vocational expert expressed this opinion, plaintiff's attorney again vigorously cross-examined him, asking him, among other things, to assume the conclusions of plaintiff's treating physicians instead of those proffered by Drs. Axline and Han. In answer to those questions, the vocational expert found, not surprisingly, that there would be no jobs for plaintiff.

Because there was evidence in the record to support the hypotheticals put to the vocational expert by the ALJ, the hypotheticals were proper.

## CONCLUSION

Plaintiff's motion for judgment on the pleadings is denied, and defendant's motion for judgment on the pleadings is granted. The Clerk is directed to enter judgment in favor of defendant, dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
         July 29, 2015